Filed 9/3/20  In re M.N. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.N., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>T.N.,<br><br>      Defendant and Appellant. | G058826<br><br>(Super. Ct. No. 18DP0660)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Gary L. Moorhead, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\*          \*          \*

T.N. (father) appeals from an order terminating his parental rights to his daughter, M.N., at a hearing held pursuant to Welfare and Institutions Code section 366.26.[1] Father argues the juvenile court erred in proceeding with the section 366.26 hearing (the .26 hearing) in his absence when the Orange County Sheriff's Department did not transport father to the hearing, as ordered, from Los Angeles County custody. As we explain below, even if the court erred in proceeding with the .26 hearing without father present or having waived his presence, the error was harmless. Consequently, we affirm.

I

BACKGROUND

M.N. was born in June 2018, and taken into protective custody two days after birth because she and her mother, M.T. (mother), tested positive for methamphetamine. Father, as the alleged father, requested a paternity test, but nonetheless wanted M.N. placed with him or the paternal grandparents. The juvenile court ordered M.N. detained from parental custody pending jurisdictional proceedings, and requested funding for expedited paternity testing. Orange County Social Services Agency (SSA) placed M.N. with relative caretakers, mother's sister (the aunt) and the sister's husband (collectively, the caregivers), where M.N. remained placed throughout the dependency proceedings.

Because only father appealed the eventual order terminating parental rights, this statement of facts primarily concerns father's background, including his lengthy criminal history and unresolved substance abuse problems, as well as his conduct during the dependency proceedings.

At M.N.'s detention hearing, the juvenile court ordered SSA to provide mother and father with six hours of weekly supervised visits. Father missed the first two

_____

[1] All undesignated statutory references are to the Welfare and Institutions Code.

2

scheduled visits, attended three visits, and then missed the next visit. The aunt, who supervised these early visits in June and July 2018, reported father "comes and goes" during visits and does not stay for an entire visit.

In early August 2018, SSA confirmed father's biological paternity. An addendum report SSA prepared for the August 2018 jurisdictional hearing noted father had recently engaged in harassing conduct toward the caregivers, calling their home multiple times, including late at night, denigrating the caregivers and complaining about the aunt's supervision of his visits with the child. Furthermore, just before the upcoming jurisdictional hearing, mother called the caregivers' home at night, demanding the caregivers give up the baby. In the call, mother told the aunt that father was threatening to hurt mother if the caregivers did not end the placement; the aunt heard father's voice in the background. The addendum report also expressed concerns about father's "less consistent in attendance and participation in visits."

At the August 2018 jurisdictional hearing, the juvenile court sustained the amended jurisdictional petition. The petition described M.N. as a child within section 300, subdivision (b), and detailed both parents' substance abuse problems, domestic violence issues (with each other and other romantic partners), and respective criminal histories, including father's numerous arrests and convictions for drug-related offenses.

A. *Order Bypassing Services for Father Under Section 361.5, Subdivision (b)(13)*

At the dispositional hearing in September 2018, the juvenile court removed M.N. from both parents' physical custody and authorized family reunification services for mother only. The court denied services for father under the bypass provisions of section 361.5, subdivision (b)(13).[2] The court specifically found, based on father's

---

[2] Section 361.5, subdivision (b)(13), authorizes bypassing reunification services where a parent has a history of extensive, abusive, and chronic drug use and has resisted or failed to comply with prior court-ordered treatment.

3

judicially noticed criminal court file, father had a nearly decade-long history of pleading guilty to drug-related offenses and then failing to complete the court-ordered drug treatment program.[3]

On the stand, father reluctantly admitted he had failed to complete six previous court-ordered drug treatment programs. Father insisted, "I don't have a substance problem."

After orally recounting a string of father's drug convictions and failed attempts at treatment, the juvenile court told father, "That is enough evidence in the court's opinion to show by clear and convincing evidence that you do have an extensive and chronic drug abuse [problem]." In addition to bypassing services, the court did not order visitation for father.

B. *Father's Visitation and Harassing Conduct During the 12-Month Reunification Period*

Though the juvenile court did not order visitation for father at the September 2018 dispositional hearing, social workers tried to facilitate father's visitation throughout the ensuing 12-month reunification period.[4] For much of that time, however, father failed to take advantage of the opportunity to visit M.N., but found time to engage in a disturbing pattern of harassing of the caregivers and mother.

According to the six-month status review report filed in March 2019, "[T]he undersigned has attempted to reach the father on a monthly basis to facilitate visitation. There has been an open visitation referral to Olive Crest during this reporting

---

[3]     In fact, at the time of the hearing father had charges pending against him for driving under the influence, possession of methamphetamine, and possession of a firearm while under the influence of a controlled substance.

[4]     At the March 2019 six-month review hearing, SSA recommended and the juvenile court ordered mother's reunification services extended for an additional six months. The court set the 12-month permanency review hearing for August 7, 2019.

period, and Olive Crest staff have also attempted to reach the father, with no success. As a result, the father's visitation referral was terminated on January 2, 2019. On January 9, 2019, the undersigned was contacted by the father by text message. The father requested visits with the child; however, he began ruminating about the mother and caregiver." The report went on to describe father's persistently disturbing conduct concerning mother and the caregivers.

According to the March 2019 status review report, in late October 2018 father sent the aunt a threatening message through the Facebook Messenger application. The message read, in part: "U son of a bitch u are not adopting my baby. . . . I won't allow u to adopt my baby do u hear me!! . . . Return my baby to my parent. I'll send my demons to eat you alive in your sleep. So don't sleep. . . ." In early December, mother filed for a restraining order against father due to his harassing and threatening behavior toward her. In late January 2019, father threatened the aunt through a Facebook post. He shared the aunt's profile picture and wrote: "This bitch has my baby -------→187[.]" SSA interpreted "187" as a reference to murder. (See Pen. Code, § 187 ["'Murder' defined"].) In response to every report of harassment, the social worker advised father not to contact or threaten the caregivers or mother.

In mid-February 2019, at father's request, the social worker submitted a new visitation referral for father for twice weekly, two-hour monitored visitation. When father met with the monitor the next month to prepare for father's first visit with M.N. "in several months," among the agreed goals for the visit was: "Help the child to become comfortable with father after a long absence[.]" According to the monitor's notes about that first visit in mid-March 2019, father did not speak to the child during the visit and had to be prompted to be affectionate with her. His next visit was easier; he was more affectionate and interactive with M.N.

For the next four and a half months, from mid-March through August 7, 2019, the date of the 12-month permanency review hearing, father consistently visited

5

M.N. in supervised visits lasting 90 minutes, twice a week. The monitor noted father affectionately greeted M.N. each visit and also kissed and hugged her goodbye. Father occasionally brought new toys or clothes for the child and he appeared happy to see her. The meager nature of father's interactions with M.N. during these visits, however, did not establish a strong parent-child bond.

From the first visits, the monitor observed father's striking failure to spend time *talking* to the child. On a visit in mid-April 2019, when M.N. was 10 months old, the monitor advised father "to talk to [M.N.] more so she could recognize his voice." At a visit a month later, after two months of regular visitation, the monitor noted, "[Father] didn't know how to interact with [child]. [Father] just held [child], and looked at [child]." The monitor also noted father needed prompting to check if M.N. needed a diaper change, and often refused to change a dirty diaper.

In the 12-month permanency review hearing report, the assigned social worker recommended the juvenile court terminate mother's reunification services and schedule a .26 hearing, based on mother's recent relapses into continued drug use, inability to obtain stable and adequate housing for herself and the child, and failure to follow up with mental health services. The social worker reported M.N. remained well-served in her placement with the caregivers, to whom she appeared securely attached. The social worker also reported on father's twice weekly, 90-minute supervised visits with M.N., describing father's frequent difficulty with the final 30 minutes of visits, his occasional requests to end visits early, his difficulty changing M.N.'s diaper, and frequent refusal to change a "poopy" diaper.

At the review hearing on August 7, 2019, the juvenile court terminated mother's reunification services and set a .26 hearing for December 2019. The court allowed mother and father to continue visitation in the interim.

C. *Father's Visits During the Post-Reunification Period*

By late September 2019, after more than five months of consistent, twice-weekly, 90-minute supervised visits, father still had not deepened his bond with M.N. In visitation reports from mid and late September, the monitor noted Father did not yet know how to interact or play with the child; father spent most visits simply giving M.N. food, watching her eat, and carrying her around.

Particularly telling are the monitor's reports of two visits, a day apart, in early October 2019. M.N. was then nearly 16 months old. During the first visit, after giving the child crackers and orange soda, father "followed" the child as she walked around. Later in the visit, "[father] checked his Facebook on his phone . . . while [M.N.] was playing with her sippy cup by herself." During father's next visit the following day, the child "fell on the ground" while walking, "and cried. [Father] picked [child] up, and comforted [child]. [Child] got upset, and didn't want to be with [father]. [Child] wanted to be with [monitor]." At father's visit the following week, the monitor again noted," [Father] didn't know how to engage with [child]. [Father] observed [child] most of the time."

The next four scheduled visits in mid-October turned out to be father's last. He failed to show up for two of these visits, and the other two were unsatisfactory, with father refusing to change the child's dirty diaper at one visit, and becoming aggressive and hostile toward the monitor at the other visit, which scared M.N. and caused her to cry. On that occasion, a sheriff's deputy had to intervene to assist the monitor in retrieving M.N. from father. On October 30, 2019, father texted the monitor to say he could not make his visit that day. Father asked the monitor to tell SSA: "'I'm going to jail.'"

7

D. *Termination of Father's Parental Rights at .26 Hearing*

In the report for the .26 hearing set for December 5, 2019, the social worker recommended termination of parental rights for both parents and a permanent plan of adoption. The social worker noted the caregivers were committed to adopt M.N., had attended to all of her needs "at a high level," and were securely attached to her, as she was to them. The report noted father was in jail in Orange County. In its "assessment/evaluation" of father, the report described father's "aggressive" and "negative" behavior toward the caregivers, which eventually dissuaded them from their initial willingness to allow father postadoption visits with the child. The report acknowledged "father continues to visit the child regularly," but stated "he is unable to manage care of the child . . . . The father is also not open to guidance or re-direction that would assist him during visits. The father has also become aggressive with his visitation monitor . . . ."

By the time of the .26 hearing date, father was apparently in custody in Los Angeles County. Consequently, on December 5, 2019, the juvenile court continued the .26 hearing 11 days to December 16, and ordered the Orange County Sheriff's Department to transport father from Men's Central Jail in Los Angeles to the December 16, 2019 hearing.

At the continued hearing on December 16, 2019, father was not present. Father's counsel asked for a continuance "to attempt to obtain my client's presence for the proceeding today." Counsel told the juvenile court, "[T]o the last of my knowledge," father had been "transported to Men's Central Jail in L.A. County" from "custody here in Orange County[.]" Counsel acknowledged the court had issued a transportation order for the day's hearing, but suggested father might have been released from custody already: "I've been informed by county counsel that [father] has been released, but I'm not sure if it was – he was released from Orange County custody or [Los Angeles] County custody." Counsel stated, alternatively, if the court denied her continuance motion, father objected

8

to the SSA recommendation and asked the court to "adopt a less permanent plan such as legal guardianship or long-term foster care."

Mother also was absent from the hearing. Mother's counsel, in "an abundance of caution," joined in the motion to continue the .26 hearing.

The juvenile court found no good cause to continue the matter and denied the motion for continuance. The court proceeded with the trial, terminated mother's and father's parental rights over M.N., and made other adverse findings and orders under section 366.26. Only father appealed the termination of parental rights.

## II

### DISCUSSION

Father argues the juvenile court erred in proceeding with the .26 hearing without father's presence or his waiver of the right to be present. Father argues the court violated both father's statutory right under Penal Code section 2625 to be physically present for the hearing[5] and his federal due process right to testify at the hearing where "his fundamental and compelling interest in her companionship, care, custody and management" of his child was at stake. Father argues this statutory and "Constitutional" error mandates reversal of the termination order. Father is wrong.

We need not resolve whether father's absence from the .26 hearing was a due process violation in addition to a statutory violation[6] because father concedes the

---

[5] Penal Code section 2625 guarantees a "prisoner" in custody in a prison or county jail the right to be physically present for a .26 hearing. Subdivision (d) of Penal Code section 2625 requires the court, upon receipt of a prisoner's request to be present for a .26 hearing, to "issue an order for the temporary removal of the prisoner from the institution and for the prisoner's production before the court[,]" and bars the court from holding the hearing in the prisoner's absence unless the prisoner signed a waiver of the right to be present. (Pen. Code, § 2625, subd. (d).)

[6] The California Supreme Court's decision in *In re Jesusa V.* (2004) 32 Cal.4th 588 (*Jesusa V.*) throws doubt on father's claim his absence from the .26 hearing violated his

9

same harmless-error standard of review applies to either claim. Under the harmless error standard, father can obtain reversal of the order terminating his parental rights only if he proves it is reasonably probable he would have obtained a more favorable result absent the error. (*Jesusa V., supra*, 32 Cal.4th at p. 625.)

Accordingly, as we explain below, we conclude father's claim of reversible error lacks merit because, even *assuming* father was a prisoner, the juvenile court's error in proceeding with the .26 hearing without father's presence or his signed waiver of that right was harmless. (See *Jesusa V., supra*, 32 Cal.4th at pp. 624-625 [harmless-error standard applies when prisoner is involuntarily absent from a dependency proceeding]; Cal. Const., art. VI, § 13.) ["No judgment shall be set aside . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)

A. *Applicable Legal Principles*

"At a .26 hearing, the court may order one of three alternative plans: (1) adoption (necessitating the termination of parental rights); (2) guardianship; or (3) long-term foster care. (§ 366.26, subd. (c)(1), (4)(A).) If the child is adoptable, there is a

federal due process rights. In *Jesusa V.*, a father sought reversal of an order sustaining a dependency petition for his child, claiming the juvenile court erred in proceeding with the adjudication when father was in prison and therefore not present at the jurisdictional and dispositional hearings. As in the present case, the father in *Jesusa V.* argued the juvenile court committed both a statutory violation under Penal Code section 2625 and, "Independently of any statutory claim, Heriberto also contends that his absence from the jurisdictional and dispositional hearing denied him due process . . . ." (*Id.* at p. 625.) The Supreme Court in *Jesusa V.* did not resolve whether the purported error constituted a due process violation, though it expressed skepticism of the idea. Noting a criminal defendant's right to be present at trial "'is statutory and not constitutional,'" the Supreme Court stated: "We do not believe the Legislature intended a different result in the analogous circumstance here, when a prisoner is involuntarily absent from a dependency proceeding. [Citation.]" (*Ibid.*) At any rate, the Supreme Court held the harmless-error standard of review applied in analyzing father's statutory and the "due process" claims. (*Id*. at pp. 625-626.)

10

strong preference for adoption over the other alternatives. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297 (*S.B.*).) Once the court determines the child is adoptable . . . , a parent seeking a less restrictive plan has the burden of showing that the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B). (*S.B.*, *supra*, 164 Cal.App.4th at p. 297.)" (*In re J.C.* (2014) 226 Cal.App.4th 503, 528 (*J.C.*).)

The particular exception at issue here is the "parental benefit" exception in section 366.26, subdivision (c)(1)(B)(i). Under that subdivision, a parent is exempted from the rule of mandatory termination of parental rights for a child found "adoptable" if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . the following circumstance[]: [¶] The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subdivision (c)(1)(B)(i).) Father argues he would have proved he qualified for the "parental benefit" exception had he been present at the .26 hearing.

In *J.C.*, *supra,* 226 Cal.App.4th 503, the court explained the steep challenge a parent faces in proving this exception applies: "The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347-1348 (*Jasmine D.*).) [¶] A parent asserting the parental

11

benefit exception has the burden of establishing that exception by a preponderance of the evidence. [Citation.]" (*J.C.*, *supra*, 226 Cal.App.4th at pp. 528-529.)

Importantly, to prove the parental benefit exception applies, a parent must show more than frequent and loving contact or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

B. *Analysis*

Father argues the juvenile court's error in allowing the .26 hearing to proceed in his absence was not harmless because his testimony was "critical" to proving the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i). Father argues in generalities, asserting his testimony would have demonstrated "the benefits of continuing his parental relationship with his daughter." At his most specific, father cites the social worker's reports of his "parenting activities" such as "play[ing] with [M.N.]"; "feed[ing] her"; "chang[ing] her clothes and diaper'"; "provid[ing] necessary items for her"; "shar[ing] hugs and kisses with her"; and "assist[ing] her as she learns to walk and speak . . . ." Father's argument concludes with the assertion, "In light of the critical value of his testimony, it is reasonably probable the proceedings would be more favorable without the court's error of denying his right to be physically present for trial." The argument lacks merit.

12

We find no possibility father could have proved the parental benefit exception applied had he testified at the .26 hearing. At the time of that hearing, father's involvement in the life of then-18-month-old M.N. was extremely minimal. Father never lived with M.N. He never cared for her unsupervised. During the seven months in which he maintained consistent visitation, his interactions with the child were limited to twice-weekly supervised visits lasting just 90 minutes each. Obviously, it is difficult to establish a close parental bond with a very young child without spending significant time personally caring for the child. Father never spent more than the allowed three hours a week with M.N.; it was not enough.

Compounding father's difficulty in developing a close bond with M.N. was the nature of his interactions with her. While father took care of physical needs such as feeding her, changing her diaper (when prompted, but not always when a diaper was dirty), changing her clothes, and lifting her into and out of a stroller or chair, father rarely spoke to the child. Rather than enticing the child into playing with him or some other form of interpersonal engagement, father spent much of each visit offering M.N. food, watching her eat, and following her around as she walked.

There is no indication in the monitor's reports M.N. found particular delight in her time with father. Nor, apparently, did she find comfort. We were struck by the monitor's report 16-month-old M.N., crying after a fall, rejected comfort from father in favor of comfort from the monitor. This stark illustration of the child's lack of emotional connection with father occurred in October 2019, after seven months of regular visitation.[7]

In response to the monitor's criticisms of father's "interactions with his daughter," father argues, "[T]he court is not bound by the monitor's—or the reporting

---

[7]    We also find merit in respondent's contention father's negative and threatening interactions with the monitor, the caregivers, and mother is additional proof termination of the parental relationship would cause M.N. no detriment.

13

social worker's—characterizations." Father contends he "has a right to describe, in his own words, the nature and value of his relationship with his daughter." But father fails to explain why the juvenile court likely would have credited father's testimony about "the nature and value of his relationship" with M.N. over the social worker's view M.N. would suffer no detriment at the termination of the relationship.

Moreover, even if father had testified persuasively his interactions with M.N. for three hours each week had been warm, stimulating, and delightful for the child, that showing could not possibly constitute the requisite "compelling reason for determining that termination would be detrimental to the child [.]" (§ 366.26, subd. (c)(1)(B)(i).) The parental benefit exception requires more than loving contact or pleasant visits. (*Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) The statutory "preference for adoption is overcome and the natural parent's rights are not terminated" only upon proof severing the parental relationship "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed[.]" (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) No such showing was possible here. (See *In re Bailey* (2010) 189 Cal.App.4th 1308, 1316-1317 [no detriment to child from terminating parental relationship "based solely on supervised visits with a child who had never been in [father's] custody and who had been continuously in the custody of the foster mother for [her] entire life"].)

In conclusion, we do not find it reasonably probable father could have obtained a more favorable result at the .26 hearing, if only the court had not held the hearing in his absence, depriving him of the right to testify. (*Jesusa V., supra*, 32 Cal.4th at p. 625.) Consequently, any error on the court's part in proceeding without his presence or his waiver was harmless.

We need not address father's additional argument the juvenile court abused its discretion in denying his attorney's motion to continue the hearing. As already demonstrated, evening assuming error, the error was harmless.

14

### III

#### DISPOSITION

The order is affirmed.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.